771 So.2d 1057 (2000)
P.W.
v.
HOUSTON COUNTY DEPARTMENT OF HUMAN RESOURCES.
S.C.
v.
Houston County Department of Human Resources.
2981362 and 2981375.
Court of Civil Appeals of Alabama.
June 2, 2000.
*1058 Kimberly A. Clark, Dothan, for appellant P.W.
Kathleen M. Nemish, Dothan, for appellant S.C.
J. Coleman Campbell and Lynn S. Merrill, asst. attys. gen., Department of Human Resources, for appellee.
YATES, Judge.
These cases involve the termination of parental rights of the father, P.W., and the mother, S.C., as to their minor child, J.C. Both parents appeal.
The Houston County Department of Human Resources ("DHR"), in June 1997, petitioned for temporary custody of the child, while the mother, who at that time was a teenager, was in DHR's custody. Following several dispositional hearings in 1997 and 1998 involving both parents, DHR, in January 1999, petitioned to terminate the parental rights of the mother and father. DHR alleged that the parents were unable or unwilling to discharge their parental responsibilities; that their conduct or condition was unlikely to change in the foreseeable future; and that there were no relative resources willing to assume custody of the child.
Following ore tenus proceedings, the court, on August 10, 1999, entered an order finding that the child was dependent, citing § 12-15-1(10), Ala.Code 1975; that the parents were unable or unwilling to provide a stable home; that there were no reasonable or viable alternatives to termination of parental rights; and that it was in the child's best interests that parental rights be terminated. Both parents appealed, arguing that DHR did not meet its burden in proving that they were unable or unwilling to discharge their parental responsibilities and that DHR did not consider all viable alternatives before petitioning for termination.
This court has consistently held that the trial court must apply a two-pronged test when a nonparent institutes proceedings seeking the termination of parental rights. See KM. v. Shelby County Dep't of Human Resources, 628 So.2d 812 *1059 (Ala.Civ.App.1993). First, the court must determine that the child is dependent, according to clear and convincing evidence. Second, the court must find that there exists no viable alternative to termination of the parent's custodial rights. J.L. v. State Dep't of Human Resources, 688 So.2d 868, 869 (Ala.Civ.App.1997). Although a child's parents have a prima facie right to custody, the paramount concern in these proceedings is the best interests of the child. Id.; see also, S.W. v. Walker County Dep't of Human Resources, 709 So.2d 1267 (Ala.Civ.App.1998).
"`The trial court is given the authority to terminate parental rights if it finds from clear and convincing evidence that the parents are unable or unwilling to discharge their responsibilities to and for the children. The trial court shall consider whether the parents have abandoned their children, whether the parents have problems with drugs or alcohol, and whether reasonable efforts to rehabilitate the parents have failed. If the children are not in the physical custody of their parent or parents, the trial court shall also consider such circumstances as whether the parents have provided material needs for the children, whether the parents have maintained regular, scheduled visits with the children, and whether the parents have adjusted their circumstances to meet the needs of the children according to agreements reached administratively or judicially.'"
A.R.E. v. E.S.W., 702 So.2d 138, 139 (Ala. Civ.App.1997) (quoting M.H.S. v. State Dep't of Human Resources, 636 So.2d 419, 421 (Ala.Civ.App.1994) (citations omitted)).
The Houston County Juvenile Court had adjudicated S.C. dependent in June 1994. She had been residing in California with her alcoholic father and her paternal grandmother and was sent to Alabama when they could no longer care for her. S.C., at age 9, was sent to live with a paternal aunt and uncle; she ran away, alleging abuse, and was temporarily placed in a shelter facility. In 1996, she was placed with another relative; however, she again ran away and was subsequently located by officials in Ozark, where she was residing with P.W. She was 16 years old, was pregnant and malnourished, and was suspected of being physically abused by P.W. She was immediately placed in a foster home. After giving birth, S.C. and the child were placed in a residential program in Selma, where S.C. could obtain parenting and independent-living skills while maintaining custody of the child. P.W. was later determined to be the child's father.
In March 1997, following a report that S.C. had neglected the child, S.C. requested that the child be placed in a foster home in Dothan. S.C. remained in the transitional-living program, obtained her GED certificate, began attending college, and obtained part-time employment. Barbara Thornton, a DHR supervisor, testified that S.C.'s progress began to decline after the child was removed; that she was prescribed medication for depression; and that in the summer of 1998 she was discharged from the program. DHR lost contact with S.C. until October 1998, when she contacted it to report that she had checked herself into a 90-day drug-treatment program in Birmingham. She moved into a transitional facility and was later terminated from the program for failing to attend aftercare sessions. S.C. stated that she is currently residing with a boyfriend at his mother's home in Birmingham; that they pay rent; that she had completed the drug-rehabilitation program; that she had been employed for the past year and was currently employed with the Birmingham racetrack, earning $6 per hour; and that she had purchased an automobile. She said that she had made several attempts to telephone the child during the past year but the foster mother had told her that she did not deserve the child and had hung up the telephone. S.C. also stated that her work schedule and the distance between Birmingham and Dothan *1060 prevented her from visiting with the child as often as she would like. She said that she wanted the opportunity to rear her child; that she felt she had matured and had improved her life over the past few years; and that she loved her child. It was reported that S.C. had visited the child six times during the past year, that she had voluntarily paid $100 in child support, and that she had brought the child clothing and toys. The psychological evaluation stated that S.C. did not display any abusive behavior; however, it stated that she could not accept the initial responsibility of parenting, primarily because of her age and immaturity. The report further stated that she was of average intelligence; that there was no evidence of current substance abuse, depression, or anxiety; and the psychologist's recommendation was that S.C. be provided additional support services to ensure adequate parenting.
At the time of the hearing, P.W. was age 23. He stated that he wanted the opportunity "to do better" with his child and that he had visited with the child on at least nine occasions during the past year. He said that initially he did not know about the child and that he had been told by DHR that because he was not paying child support, he should not have contact with the child. Further, he stated that he had not paid child support because he was unemployed and that he had had difficulty in locating employment based on his past criminal history and his lack of a highschool diploma, and that he realized that he had not accepted responsibility in rearing his child. P.W. stated that he had just accepted a job and would be moving from his mother's home into an apartment with his cousin. DHR testified that P.W. was $4,108 in arrears in child support. DHR further stated that he had initially agreed to the termination of his parental rights; that he had been included in the individual-servicing-plan ("ISP") meetings; and that he had failed to attend an angermanagement class, which had been recommended. DHR also stated that P.W. had provided the paternal grandmother as a potential relative resource; however, it is unclear from the testimony whether DHR followed up with the grandmother, other than inviting her to one ISP meeting.
After thoroughly reviewing the record, we conclude that the evidence supports the termination of the mother's and the father's parental rights. The trial court had the opportunity to hear and observe the witnesses, including both parents. We, therefore, accept the trial court's determination that DHR carried its burden of proving that the mother and father are unable to provide a stable home environment for the child and that it is in the child's best interests to terminate parental rights.
AFFIRMED.
ROBERTSON, P.J., and MONROE and THOMPSON, JJ., concur.
CRAWLEY, J., concurs in part and dissents in part.
CRAWLEY, Judge, concurring in part and dissenting in part.
I concur in the judgment affirming the termination of the parental rights of P.W., the father; that termination is supported by clear and convincing evidence. I dissent, however, from the affirmance of the judgment terminating the parental rights of S.C., the mother.
The mother was 17 years old and single when she gave birth to J.C. She was, herself, a foster child; she had spent her formative years with an alcoholic father and a succession of other relatives. The record establishes that, initially, she was not a very responsible parent to J.C. However, the record also establishes that, currently, she has made great progress in living independently and accepting responsibility for her child.
"This court has held that `evidence of current conditions or conduct relating to a parent's ability or willingness to care for his or her children is implicit in the *1061 requirement that termination of parental rights be based on clear and convincing evidence.'"
V.M. v. State Dep't of Human Resources, 710 So.2d 915, 920 (Ala.Civ.App.1998) (quoting Bowman v. State Dep't of Human Resources, 534 So.2d 304, 306 (Ala.Civ. App.1988)) (emphasis added in V.M.). See also K.A.C. v. Jefferson County Dep't of Human Resources, 744 So.2d 938, 940 (Ala.Civ.App.1999) (noting that the trial court "focused most of its findings on [the father's] prior history in determining he could not properly parent his minor child" and holding "that the father's recent evaluations do not support this conclusion") (emphasis added).
When a child is not in the physical custody of the mother, the trial court is required to consider whether the mother has shown a "[l]ack of effort ... to adjust [her] circumstances to meet the needs of the child in accordance with agreements reached ... with [DHR]." § 26-18-7(b)(4), Ala.Code 1975. In the present case, the mother met most of the requirements DHR outlined in its ISP for her. During the year before the termination hearing, the mother secured stable employment, bought a car, and began paying apartment rent. She enrolled herself (with no prompting by DHR) in a drug-treatment program and successfully completed the program. She visited her child and bought him gifts and toys. It is undisputed that she loves the child and does not want to lose him.
In my opinion, DHR's decision to move for the termination of the mother's rights was too hasty. Compare V.M. v. State Dep't of Human Resources, 710 So.2d at 920 (holding: "The trial court's decision to terminate the mother's parental rights was premature in light of the evidence that she had been working diligently for approximately one year before trial in an effort to change her circumstances and in light of the evidence that she had made significant progress at the time of trial; therefore, its judgments were plainly and palpably wrong."). The mother shows every indication that with continued support from DHR and others she would develop into the kind of parent the child deserves and DHR approves of.