[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 402 
Crowne Investments, Inc., operator/owner of a skilled nursing facility, and Crowne Management Corporation, a service provider for Crowne Investments, appeal from the judgment of the trial court rendered pursuant to a jury verdict in favor of the plaintiff, Lisa G. Reid, as administratrix of the estate of her grandfather, Arl George, in an action to recover damages for his alleged wrongful death. We affirm.
On August 31, 1995, Reid sued Crowne Investments, the owner and operator of the skilled nursing facility at which Mr. George resided. Reid alleged that Crowne Investments had negligently caused or allowed Mr. George to be fed by his wife, who was not medically trained to feed someone in Mr. George's condition. Reid alleged that this negligence caused Mr. George to suffer an asphyxiation event and that he died as a proximate consequence of this negligence. On November 6, 1996, Reid amended her complaint to add Crowne Management Corporation as a defendant. Crowne Management was under contract with Crowne Investments to manage the nursing home at which Mr. George resided.
On June 5, 1997, Crowne Investments filed a motion to preclude Reid from calling Marian C. Skinner as an expert witness. On September 2, 1997, the trial court granted that motion. Crowne Investments filed a second motion to preclude, seeking to preclude Reid from calling Melba Jean Findley as an expert witness, and filed a motion for summary judgment. On October 7, 1997, the trial court denied both motions. Crowne Investments then filed another motion, to preclude testimony of Melba Jean Findley and Deborah Allsup. The trial court denied this motion on December 22, 1997, and the case proceeded to trial.
The jury returned a $750,000 verdict against Crowne Investments and Crowne Management, and the court entered a judgment on that verdict. The defendants filed a joint motion for a new trial; to alter, amend, or vacate the judgment; for remittitur; and for judgment as a matter of law ("JML"). On August 17, 1998, the trial court denied this motion; the defendants appealed. Reid cross appealed, but she does not want us to address the issues raised in her cross appeal unless we conclude that the judgment is due to be reversed. Because we affirm the judgment, we do not address the issues presented in Reid's cross appeal.
The defendants, represented jointly on appeal, raise three issues: 1) Whether the trial court erred in denying them a JML or a new trial based on an alleged absence of expert testimony; 2) whether Reid's expert witness qualified as a "similarly situated health care provider"; and 3) whether the trial court erred in admitting testimony concerning other acts and omissions occurring at the nursing home. *Page 403 
Because the arguments relating to the first two issues are based on the same statute, we resolve those issues in one analysis, in part I. We address the third issue in part II.
 I.
The defendants argue that the trial court erred in denying their motion for a new trial or for a postverdict JML. They point out that this is a medical-malpractice case and required expert testimony. They assert that Reid failed to establish the standard of care applicable to skilled and intermediate nursing-care facilities and, therefore, failed to make a prima facie case of negligence. The defendants argue that Reid presented no expert testimony to support her claims against Crowne Management, and, therefore, that Crowne Management was entitled to a postverdict JML and Crowne Investments is entitled to a new trial.
Crowne Investments entered into a "Management Agreement" with Crowne Management. The contract was effective from June 1, 1988, through May 31, 1998, unless terminated sooner or extended, as provided by the terms of the contract. Under the terms of the contract, Crowne Management agreed to supervise, manage, and operate the nursing home at which Mr. George resided. Crowne Management was responsible for hiring employees; negotiating labor, utility, and concessionaire contracts; purchasing operating supplies; making necessary repairs; obtaining licenses; acquiring insurance; paying taxes (from Crowne Investments' funds); and depositing and disbursing funds.
Reid argues that both Crowne Investments and Crowne Management owed a duty to Mr. George and are subject to liability for his alleged wrongful death. She contends that that duty arose under the Alabama Medical Liability Act of 1987 ("AMLA"), Ala. Code 1975, §§ 6-5-540 through -552; under the common law; and under Crowne Management's "Management Agreement" with Crowne Investments. She maintains that Crowne Investments and Crowne Management breached their duty of care and that their breach proximately caused Mr. George's death.
The AMLA, at § 6-5-542, defines the term "health care provider" as "[a] medical practitioner, dental practitioner, medical institution, physician, dentist, hospital, or other health care provider as those terms are defined in Section 6-5-481." Section 6-5-481(7) defines "hospital" as "[s]uch institutions as are defined in § 22-21-21 as hospitals." (Section 6-5-481(7) refers to the definition at § 22-21-21; that section, however, contains no definition. The reference to § 22-21-21 apparently was intended to be a reference to § 22-21-20.) Section 22-21-20
defines "hospitals" as including "long term care facilities such as, but not limited to, skilled nursing facilities [and] intermediate care facilities." See Rosemont, Inc. v. Marshall,481 So.2d 1126 (Ala. 1985). Crowne Investments operates a skilled nursing facility; therefore, it is a "hospital" for purposes of the AMLA.
The AMLA defines "other health care providers" as "[a]ny professional corporation or any person employed by physicians, dentists, or hospitals who are directly involved in the delivery of health care services." Ala. Code 1975, § 6-5-481(8). Crowne Management is a professional corporation employed by Crowne Investments, a "hospital," and Crowne Management is directly involved in the delivery of health-care services. Therefore, it is a "health care provider" as defined by the AMLA.
Section 6-5-484(a), Ala. Code 1975, reads, in pertinent part:
 "In the case of a hospital rendering services to a patient, the hospital must use that degree of care, skill, and diligence used by hospitals generally in the community." *Page 404 
Mr. George was a "patient" and Crowne Investments was a "hospital" for the purposes of § 6-5-484. Therefore, in order to prevail, Reid had to establish at trial that Crowne Investments and Crowne Management, in rendering services to Mr. George, or in failing to do so, did not use that degree of care, skill, and diligence used by skilled nursing facilities generally in the community.
Under the AMLA, in order for a plaintiff to prevail in a wrongful-death action against a nursing home, the plaintiff must establish the appropriate standard of care; must prove that the nursing home failed to comply with that standard of care; and must prove that the nursing home's failure to comply proximately caused the death. See Jackson v. Pleasant Grove Health Care Ctr.,980 F.2d 692 (11th Cir. 1993). Under the AMLA, a plaintiff establishes proximate cause by demonstrating that an injury or death was probably caused by the defendant's conduct. Ala. Code 1975, § 6-5-549.
To establish a hospital's and a health-care provider's negligence in an action under the AMLA, the plaintiff ordinarily must offer expert medical testimony as to what is or what is not the proper practice, treatment, and procedure. In such an action, a lack of expert medical testimony results in a lack of the proof essential to establish the plaintiff's case. See Rosemont, supra, 481 So.2d at 1129 (citing Parrish v. Spink, 284 Ala. 263,224 So.2d 621 (1969); Tuscaloosa Orthopedic Appliance Co. v. Wyatt,460 So.2d 156 (Ala. 1984)).
The defendants argue that Reid's expert witness, Deborah Allsup, was not qualified to offer an opinion about the conduct of Crowne Management because, they say, Allsup had never served in a managerial capacity. The defendants also assert that Reid presented no expert testimony establishing the standard of care and indicating that the actions of the employees of Crowne Management breached that standard.
We must first determine whether Reid established the standard or standards of care she alleges the defendants breached. In her second amended complaint, Reid made these allegations against Crowne Investments and Crowne Management:
 "9.(a) Crowne Investments failed to properly and timely evaluate [Arl George's] needs and condition . . .
 "(b) Crowne Investments failed to provide adequate care and protection for Arl George . . . so as to protect him against being injured and killed and to provide him proper care and attention to his needs as a patient. . . .
 "(c) Crowne Investments failed to staff according to appropriate levels for the care . . . of Arl George on September 8, 1993; and/or . . .
" . . .
 "(g) Crowne Investments failed to properly monitor the weight and/or health condition of Arl George; and . . .
" . . .
 "(i) Crowne Investments improperly restrained Arl George and failed to properly supervise, observe and/or protect Arl George . . . to the end he was improperly restrained on September 8, 1993. . . .
 "(j) Crowne Investments failed to assign and/or failed to keep in place proper caregivers . . . on September 8, 1993. . . .
" . . .
 "(l) Crowne Investments . . . failed to take appropriate measures to prevent Hattie George from feeding or attempting to feed Arl George. . . .
 "(m) Crowne Investments improperly administered drugs and/or medications to Arl George. . . .
 "(n) Crowne Investments failed to prevent food from being left unattended in Arl George's room. . . . *Page 405 
 "10.(a) Crowne Management failed to properly supervise, manage and operate the Facility. . . .
 "(b) Crowne Management failed to properly hire, promote, discharge and supervise the work of the Facility's administrator . . . and all operating and service employees performing services. . . .
 "(e) Crowne Management failed to properly determine and establish appropriate operating policies affecting the standards of operation. . . ."
Allsup testified that at the time of the asphyxiation event, the standard of care for skilled nursing homes when feeding a patient (resident) who had been identified as a "total feeder" (a patient who is unable to feed himself or herself) was to allow the patient to be fed only by a qualified certified nursing assistant ("CNA"). Mr. George was considered a total feeder. Allsup also testified that it is the standard of care in a nursing-home facility that when the CNA brings a meal tray to the resident's room, the CNA feeds the resident, removes the tray, and documents how much the resident ate. A CNA, Allsup said, should not leave the tray in the room.
Allsup testified that it was the standard of care that all CNAs have CPR training and that a failure to perform the Heimlich maneuver for a choking patient is a deviation from the standard of care. She testified that in regard to a choking patient it is a breach of the standard of care not to perform a suctioning technique in an attempt to open the patient's air passage. Allsup stated that it is the standard of care to telephone the emergency 911 number rather than to call a conventional ambulance service when a choking patient has turned blue. She testified that a person required to be restrained should not have more than one form of restraint at the same time and that a member of the nursing staff should be required to check on a restrained person every 30 minutes and to remove the restraint every 2 hours. Allsup testified that both defendants breached these standards of care and that these breaches proximately caused Mr. George's death. If Allsup was qualified to offer this testimony, then we must conclude that it was sufficient to establish the appropriate standard of care and that from this testimony the jury could have found a breach of that standard.
We must now determine whether Allsup qualified as a "similarly situated health care provider" — which she had to be in order to testify as to the breach of these standards of care. The AMLA provides specific guidelines that must be followed for a witness to be qualified to testify against a health-care provider. Section 6-5-548 states, in pertinent part:
 "(b) If the health care provider whose breach of the standard of care is claimed to have created the cause of action is not certified by an appropriate American board as being a specialist, is not trained and experienced in a medical specialty, or does not hold himself out as a specialist, a `similarly situated health care provider' is one who:
 "(1) Is licensed by the appropriate regulatory board or agency of this or some other state; and
 "(2) Is trained and experienced in the same discipline or school of practice; and
 "(3) Has practiced in the same discipline or school of practice during the year preceding the date that the alleged breach of the standard of care occurred."
Allsup is a registered nurse, a CNA, and a licensed nursing-home administrator. She has worked as a "charge nurse," in which job she supervised the nursing staff on her floor. Allsup has worked as a director of nursing and as an administrator of a nursing home. Allsup is licensed and trained by the "appropriate regulatory board[s]."
Allsup had practiced as a registered nurse in a nursing home during the year *Page 406 
preceding September 8, 1993, the date of the asphyxiation incident. She had worked as a director of nurses and had had hands-on experience in taking care of patients during that same period. Each of the standards of care the plaintiff says the defendants breached involved "hands-on" nursing care and monitoring persons qualified to provide that care. Allsup also had treated nursing home patients and had supervised nurses at nursing-home facilities during the year preceding September 8, 1993.
Crowne Management contends that Allsup was not qualified to state an opinion as to its conduct. Crowne Management argues that Reid charged Crowne Investments with failure to properly restrain, administer medication, feed, and otherwise care for Mr. George, and charged Crowne Management with failure to perform management obligations, such as its obligation to properly supervise personnel, which failure she alleged caused or contributed to the omissions of Crowne Investments. Relying upon Ex parte Main,658 So.2d 384 (Ala. 1985), Crowne Management contends that it is a health-care provider within the meaning of that term as it is used in the AMLA. In Ex parte Main, this Court held that found a nurse assigned by a workers' compensation carrier to monitor an injured worker's rehabilitation was qualified as a "health care provider," and, therefore, that claims against her were controlled by the AMLA.
Crowne Management had only two employees, neither of whom was a nurse or was qualified to know the standard of care for nurses. Crowne Management attacks the credentials of Reid's expert witness for her lack of expertise as a manager with responsibilities and duties such as those owed by Crowne Management to Crowne Investments. However, Crowne Management cannot so narrowly define its responsibilities to Crowne Investments and its patients in a setting where Crowne Management invokes the benefit of the provisions of the AMLA. In effect, Crowne Management asks us to allow it to staff its operation with people who are excellent business managers, but incompetent nurses, while it relies upon its status as a health-care provider under the AMLA to block the testimony of any expert without a similar background. However, Crowne Management's insistence upon its status as a health-care provider and its employment of managers who lacked the medical expertise to supervise persons who had the necessary medical expertise do not prevent Reid from offering the testimony of an expert with such experience.
We are not here presented with an attack on the credentials of Reid's expert in the context of management of a facility in areas outside the realm of rendering health-care services, as to which areas the AMLA would not apply. For example, Allsup was not asked to give an opinion as to the propriety of the accounting methods used by Crowne Management. Reid offered an expert in the health-care aspect of Crowne Management's operations. Under Exparte Main, supra, Crowne Management, for that aspect of its activities related to health care, is subject to the AMLA, and Allsup did not have to be qualified in other areas of Crowne Management's activities that were not relevant to the matters made the basis of Reid's claim.
Under the AMLA, Allsup, in order to be qualified to offer her testimony, had to have practiced in the same discipline during the year preceding the alleged breach. Therefore, in order to qualify as an expert testifying on each of the relevant issues in this case, Allsup must have practiced hands-on nursing and worked in the supervision of nursing at a nursing-home facility during the year preceding September 8, 1993. She testified that she practiced as a registered nurse in a nursing home during that period. Allsup also testified that she was a director of nurses during that period.
The defendants contend that the witness must work the entire year in the same *Page 407 
discipline. The Court of Civil Appeals has dealt with a similar claim in regard to § 6-5-548, in Sledge v. ColbertCounty Northwest Alabama Health Care Authority, 669 So.2d 182
(Ala.Civ.App. 1995). Robert Sledge filed a medical-malpractice action against a hospital in connection with the alleged failure of the hospital to diagnose a patient's severe subdural hematoma. The trial court entered a summary judgment in favor of the hospital. The incident in question occurred on April 12, 1990; therefore, the year preceding that date, April 12, 1989, to April 12, 1990, would be the period during which the tendered expert witness must have practiced in order to be qualified under §6-5-548. The witness had worked as vice president for Continental Investors Life Insurance Company in 1988-89; however, there was no indication that this employment was in the discipline required by the facts of the case. The witness's affidavit indicated that she had been employed since 1989 as the director of medical-surgical nursing at Shelby Medical Center. However, the Sledge court held that it was unclear where she had practiced during the year preceding April 12, 1990. The Sledge court held that the witness could not testify as an expert because the plaintiff had failed to show affirmatively that the witness had practiced in the same discipline or school of practice during the year preceding the alleged incident of malpractice. It is possible that the witness could have begun work as director of nursing after April 12, 1990 — and that would have been "since 1989." The Sledge court did not require that the witness be employed in the same discipline for the entire year, but only that she be employed in that discipline sometime during the year preceding the alleged breach. In accordance with the decision in Sledge, we conclude that Allsup must have been employed in the same discipline sometime between September 8, 1992, and September 8, 1993. Allsup testified that for a portion of that time she worked in a nursing home as a registered nurse and as director of nursing. Allsup met the third criterion of a "similarly situated health care provider" as that term is defined in § 6-5-548(b).
As a "similarly situated health care provider," Allsup was qualified to testify in this medical-malpractice action. She testified as to the proper standards of care; she testified that the defendants breached those standards; and she further testified that the defendants' failure to comply with those standards proximately caused Mr. George's death. Therefore, the trial court properly denied the defendants' motion for a new trial or a JML.[1]
 II.
The third issue raised is whether the trial court erred in admitting testimony by Reid's witness Perrie Lewis about other acts and omissions of the Crowne nursing facility. The defendants argue that admitting this testimony violated § 6-5-551 of the AMLA. That section provides, in pertinent part:
 "Plaintiff shall be prohibited from conducting discovery with regard to any other act or omission or from introducing at trial evidence of any other act or omission. Any complaint which fails to include [the] detailed specification and factual description of each act and omission [as required in an earlier sentence of this section] shall be subject to dismissal for failure to state a claim upon which relief can be granted."
The record reflects that Crowne's[2] cross-examination of Lewis *Page 408 
"opened the door" to admission of evidence of other acts or omissions. Crowne asked Lewis about what she had observed regarding services rendered to other patients and what her impression was as to the quality of health care rendered to members of the Lewis family who were residents at the same facility. A party who opens the door to an otherwise objectionable area of testimony cannot claim error when the opposing party introduces similar evidence. Brabner v. Canton,611 So.2d 1016, 1018 (Ala. 1992) (citing Charles W. Gamble,McElroy's Alabama Evidence § 20.01 (4th ed. 1991)).
Reid's redirect-examination of witness Lewis led off with a question regarding other acts, and the defendants did not object. The witness was asked, "Did you ever see patients go unfed?" and, with no objection from Crowne, she answered, "Yes." Crowne objected in the middle of the witness's answer to the next question, which asked for further information about patients going unfed; the objection came too late. One cannot preserve error by objecting to a question after the witness has given a responsive answer. General Motors Corp. v. Johnson, 592 So.2d 1054 (Ala. 1992). If the witness's answer came too quickly for Crowne to object, then Crowne's proper remedy would have been to make the belated objection and to make a companion motion to strike or exclude the question and answer. Green v. Standard Fire Ins. Co.of Alabama, 398 So.2d 671 (Ala. 1981). Crowne made no such motion.
After the belated objection, Reid asked further questions concerning treatment of other patients. Crowne made no objection, nor did it request a continuing objection. If a question is repeated in a different form after the opponent has objected to the original question, then the opponent must make an additional objection in order to preserve error. Pardue v. Citizens Bank Trust Co., 287 Ala. 50, 247 So.2d 368 (1971).
Crowne had made a motion in limine asking for an order prohibiting the plaintiff from referring to the care given by Crowne to patients other than Mr. George. The court granted that motion.[3] However, the court's granting that motion in limine did not excuse Crowne's lack of a proper objection to the question it complains of. See Bowens v. Southern Ry., *Page 409 599 So.2d 588 (Ala. 1992). In that case, the trial court granted the plaintiff Bowens's motion in limine to prohibit the defendant from mentioning the plaintiff's marital status and from mentioning the plaintiff's being treated for alcoholism without first obtaining the permission of the judge after a discussion outside the presence of the jury. 599 So.2d at 588. At Bowens's trial, the defendant asked Bowens about his marital status and his treatment for alcoholism. Id. at 590. Bowens did not object. This Court held that because the trial court's order was conditional or preliminary, Bowens had to object to the questions and that his failure to do so did not preserve the issue for review. Id. Also, Bowens was similar to this present case, in that the plaintiff Bowens opened the door to the questions he said were improper; he did so, while answering a question, by referring to the physician who had prescribed his medication as a physician specializing in, among other things, treatment of alcoholism. Id.
As was the case with the Bowens motion in limine, the trial court's ruling on Crowne's motion in limine was conditional, in that it allowed the court to revisit its ruling later in the trial. Crowne was required "to object to the introduction of the testimony and state the grounds for [its] objection." Bowens, 599 So.2d at 590. Crowne did not do that, and it therefore did not preserve the issue for appeal.
The judgment is due to be affirmed.
1980063 — AFFIRMED.
1980141 — AFFIRMED.
Hooper, C.J., and Maddox, Houston, Cook, See, Lyons, Brown, and Johnstone, JJ., concur.
[1] Because of our resolution of this issue regarding the adequacy of Reid's expert testimony as to the liability of Crowne Management, we do not reach Crowne Management's contention that there was no evidence of an agency relationship that would allow the jury to impute to it liability for the conduct of Crowne Investments.
[2] Crowne Investments and Crowne Management were represented by the same counsel; therefore, they are referred to collectively as "Crowne" in this portion of the opinion, where differentiation between the two is unnecessary.
[3] The court granted the following motion in limine:
 "Comes now Defendant, Crowne Investments, Inc. (`Crowne'), and hereby moves that this Court [enter an] Order providing:
 "(a) Plaintiff and her attorneys and witnesses shall not mention, introduce evidence concerning, or make reference to in opening or closing statement or otherwise, directly or indirectly, matters set forth in the paragraphs below.
 "(b) All witnesses called by Plaintiff has [sic] been admonished by Plaintiff before testifying outside the presence of the jury not to refer to the matter set forth in the paragraphs below.
 "(c) Plaintiff and her attorneys and witnesses shall be precluded from making any reference to this Motion or any resulting Order.
"This Motion is directed to the following matters:
" . . .
 "6. Any reference or testimony relating to care given to any other resident or patient
" . . .
 "Each of the matters set forth in paragraphs 1-7 above is generally inadmissible, irrelevant, and prejudicial to Defendant's right to obtain a fair and impartial trial. Should any of the matters set forth above become material, relevant, and admissible during the course of the trial, counsel for Plaintiff can bring such matter to the Court's attention outside the presence of the jury, receiving a ruling thereon, and thus preserve Plaintiff's rights. Failure of the Court to grant this Motion in Limine will allow Plaintiff a free hand to inject such inadmissible and prejudicial matters before the jury. Even if Defendant's objection to the injection of such material, by questions, statements or otherwise, are sustained, harm will have been accomplished.
 "For the foregoing reasons, Defendant requests that the Court grant this Second Motion in Limine."