[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1028 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1029 
L.A.C. ("the mother") appeals from a judgment terminating her parental rights to her son, seven-year-old T.J.H. ("the child"). The case for terminating the mother's rights hinged largely on proof that the mother was addicted to drugs, that the mother had failed to acknowledge that the child had been sexually abused by his 15-year-old stepbrother, and, accordingly, that the mother had failed to protect the child from abuse.
On appeal, the mother raises two issues: (1) that the juvenile court erred by admitting hearsay, and (2) that the judgment terminating her rights was not supported by clear and convincing evidence. The mother argues that the juvenile court erred by admitting hearsay in three instances, namely: (A) statements by the child indicating that he had been sexually abused by his stepbrother and that he had "smoked pot [marijuana] with his mother," that were admitted through the testimony of Alicia McClain, a child-abuse-and-neglect investigator for the Cullman County Department of Human Resources ("DHR"), and Lisa McSwain, a forensic interviewer with the Children's Advocacy Center of Cullman; (B) a report prepared by an employee of the Children's Hospital Intervention Program ("CHIPS"), submitted to DHR caseworker Summer Davis and admitted through the testimony of Alicia McClain; and (C) a written report of a home study conducted by DHR foster-care worker Janan Blaylock and admitted through the testimony of Janan Blaylock.
 I. Hearsay (A) Statements by the child
Three statements by the child are at issue, one elicited through Alicia McClain's testimony and two elicited through Lisa McSwain's testimony. Alicia McClain testified without objection that she had received two sexual-abuse reports concerning the child. She stated that both reports named J.C., the mother's 15-year-old stepson and the child's stepbrother, as the perpetrator of the alleged abuse. McClain said the investigation of the first report, which she received in 1999, was closed and the allegations were deemed to be "not indicated" because the child was only four years old at the time and was "not verbal enough to give any disclosure." McClain received the second report in March 2001. McClain testified that, in response to the second report, she, along with Lisa McSwain, questioned the child who, at that time, was five and one-half years old. During the direct examination of McClain, the following occurred:
 "Q. [By the attorney for DHR]: And how were [the child's] verbal skills at that point?
 "A. [By McClain]: He — You could understand him. He was very verbal.
 "Q. And did he disclose anything or can you tell us the nature of that interview with [the child]?
 "A. I can. He stated that [J.C.] `put his wienie in his butt' and that [J.C.] would touch his wienie —
 [Attorney for the mother]: Object to the statement as hearsay. The child is not present, Your Honor."
The juvenile court overruled the mother's hearsay objection. Thereafter, McClain testified as follows:
 "[The child] also said that [J.C.] would try to get him to touch his wienie and *Page 1030 
that [J.C.] would touch his wienie on top of his clothing also.
 "When we asked [the child] about oral sex, if [J.C.] had performed oral sex on him or if [J.C.] had asked him to perform oral sex on him, [the child] became very fidgety and got up and started to move around and said he didn't want to talk about it anymore, he wanted to watch a movie. So we stopped that discussion. We also spoke with him about possible drug use, and he said that his mother smoked weed and he talked about her using a pipe and a bong, and he said that she gave him weed to smoke also. And he said that since he had been staying with his stepmother, . . . that he had stopped smoking pot."
Lisa McSwain testified that she and McClain interviewed the child on April 2, 2001. During the direct examination of McSwain, the following occurred:
 "Q. [By the attorney for DHR]: Okay. Can you tell us about that interview?
 "A. [BY McSwain]: In interviewing [the child], he disclosed anal penetration on more than one occasion by [J.C.]
 "Q. Did he disclose anything else of concern in the interview?
"A. He also disclosed —
 "[Attorney for the mother]: I'm going to object on hearsay. Again, Your Honor, this child is old enough to appear in court.
 "[Attorney for DHR]: Your Honor, again, we — Ms. McSwain is a forensic interviewer for sexual abuse allegations and this is what her department does. There is no way of us getting what her investigation or interview did without her testimony, and she is here to be cross-examined by the counsel when we're finished with direct.
 "THE COURT: . . . I'm going to go ahead and overrule again. At the time, [the child] was very young, plus we're going to — we can't get her records in under the business exception, so she's here for you to cross-examine and that's the reason we have her here today.
 "Q. [By the attorney for DHR]: Okay. Again, were there any other concerns that were — you were made aware of other than the sexual penetration?
 "A. [The child] also disclosed that [J.C.] had put his mouth on his wiener, which was his penis — he referred to that as his penis — and he also disclosed that he had smoked pot with his mother."
Section 12-15-65(i), Ala Code 1975, provides:
 "(i) A statement made by a child under the age of 12 describing any act of sexual conduct performed with or on the child by another, not otherwise admissible by statute or court rule, is admissible in all dependency cases brought by the State of Alabama acting by and through a local department of human resources if:
 "(1) The statement was made to a social worker, child sex abuse therapist or counselor, licensed psychologist, physician, or school or kindergarten teacher or instructor; and
 "(2) The court finds that the time, content, and circumstances of the statement provide sufficient indicia of reliability. In making its determination, the court may consider the physical and mental age and maturity of the child, the nature and duration of the abuse or offense, the relationship of the child to the offender, and any other factor deemed appropriate.
 "A statement may not be admitted under this section unless the proponent *Page 1031 
of the statement makes known to the adverse party the proponent's intention to offer the statement and the particulars of the statement sufficiently in advance of the proceedings to provide the adverse party with a fair opportunity to rebut the statement. This child hearsay exception applies to all hearings involving dependency including, but not limited to, the 72-hour hearing, the dependency hearing, and the disposition hearing."
(Emphasis added.)
In T.W.W. v. Lauderdale County Department of Human Resources,628 So.2d 761 (Ala.Civ.App. 1993), this court assumed without deciding that § 12-15-65(g), Ala. Code 1975 (the predecessor to § 12-15-65(i)), was applicable in a parental-rights-termination proceeding. We now make explicit what was implied in T.W.W.:
the procedure for admitting, at a parental-rights-termination proceeding, a "statement made by a child under the age of 12 [that describes] any act of sexual conduct performed with or on the child by another" is set out in § 12-15-65(i), Ala. Code 1975. The child's statement is admissible if the following requirements are met: (a) the statement was made to one of the persons named in subsection (1) of the statute; (b) the court determines, under the guidelines set out in subsection (2) of the statute, that the statement has "sufficient indicia of reliability" to make it admissible; and (c) the proponent of the statement has provided the adverse party with the notice and opportunity to rebut the statement described in the last paragraph of § 12-15-65(i).
In the present case, none of the requirements for admitting the child's statements relating to the alleged sexual abuse were satisfied. Compare L.M. v. State, 591 So.2d 883, 885
(Ala.Civ.App. 1991) (noting that the trial court's order addressed the "factors specified in § 12-15-65 [(i)]" and the trial court could have found the child's hearsay statement to a physician was admissible because the statement had "`sufficient indicia of reliability'" based on the "`time, content, and circumstances of the statement'"). Nevertheless, we hold that the admission of testimony by McClain and McSwain regarding the child's reports of sexual abuse did not constitute reversible error.
(1) For the first statement (referring to anal penetration), the mother failed to make a timely objection to McClain's testimony. It is well settled that an objection that comes after the witness's answer is too late. See Crowne Invs., Inc. v.Reid, 740 So.2d 400, 408 (Ala. 1999); Ford v. Thomas,482 So.2d 1217, 1219 (Ala.Civ.App. 1985).
 "One cannot preserve error by objecting to a question after the witness has given a responsive answer. General Motors Corp. v. Johnston, 592 So.2d 1054
(Ala. 1992). If the witness's answer came too quickly for [the mother] to object, then [the mother's] proper remedy would have been to make the belated objection and to make a companion motion to strike or exclude the question and answer. Green v. Standard Fire Ins. Co. of Alabama, 398 So.2d 671 (Ala. 1981). [The mother] made no such motion."
Crowne Invs., 740 So.2d at 408.
(2) For the child's second statement (that his stepbrother J.C. had subjected him to oral sex), the mother timely objected to the question that resulted in McSwain's testimony. The juvenile court overruled the objection. That ruling was erroneous. Although testimony concerning the child's statement that he had been subjected to oral sexual contact might have been admitted by complying with the procedure *Page 1032 
outlined in § 12-15-65(i) as discussed above, DHR, the proponent of the evidence, made no effort to comply with the statute. Therefore, we hold that, in the absence of compliance with § 12-15-65(i) or a showing that the child's statement otherwise qualified as an exception to the hearsay rule, the admission of the testimony was error.
Under the circumstances, the error was harmless to the mother. Before Lisa McSwain testified, Alicia McClain had already revealed the child's statements with regard to J.C.'s anal penetration and genital fondling of him. McClain testified that, when the subject of oral sex was broached, the child became fidgety and evasive. Therefore, McSwain's testimony about J.C.'s subjecting the child to oral sex added little or no prejudice tothe mother beyond that already in evidence. Had J.C. been on trial, our conclusion might be different. The primary question in this case, however, was the mother's culpability, not J.C.'s guilt or innocence. That question entailed an inquiry into the reasonableness of the mother's disbelief of the sexual-abuse allegations and the mother's ultimate responsibility for failing to protect the child from J.C. In view of the previously admitted testimony regarding allegations of genital fondling and anal penetration, we conclude that the additional testimony regarding an allegation of oral sex adds little or nothing to the resolution of whether the mother was culpable for failing to protect the child from J.C.
(3) For the child's third statement (that he had "smoked pot with his mother"), § 12-15-65(i) obviously provides no basis for admitting the testimony because the child's revelation was not a statement describing "an act of sexual conduct performed with or on the child by another." The child's statement was an extrajudicial assertion offered to prove the truth of the matter asserted; it was, therefore, hearsay by definition. See Rule 801(c), Ala. R. Evid.; Meriwether v. Crown Inv. Corp.,289 Ala. 504, 268 So.2d 780 (1972). At trial, DHR offered no basis upon which the statement might be considered nonhearsay, see Rule 801(d), Ala. R. Evid., or whether it might be admissible under an exception to the hearsay rule, see Rules 803 and 804, Ala. R. Evid.
On appeal, DHR argues that the evidence was cumulative because the trial court had already heard the evidence at the shelter-care hearing, it could have taken judicial notice of the evidence presented at the earlier dependency proceeding, and it "was not required either to ignore or to attempt to forget the past," citing Witcher v. Motley, 417 So.2d 208, 209
(Ala.Civ.App. 1982). Witcher cites no authority for the proposition stated and is contrary to this court's decision inY.M. v. Jefferson County Department of Human Resources,890 So.2d 103 (Ala.Civ.App. 2003). In Y.M., we stated:
 "`There are persuasive policy arguments for relaxed rules of evidence in certain stages of child protection proceedings. For example, at an emergency removal hearing, there may not be time to subpoena a witness and whatever information is available may be needed for the protection of the child. At disposition or review, where the court is evaluating the case plan and case progress, it is often unnecessary and expensive to bring in each person who has provided important information to the caseworker.'
 "Mark Hardin, Child Protection Cases in a Unified Family Court, 32 Fam. L.Q. 147, 179 (1998). . . . See, e.g., In re A.C., 751 So.2d 667
(Fla.Dist.Ct.App. 2000) (holding that the contents of the case file of the Department of Children and Families was inadmissible in an adjudicatory *Page 1033 
hearing on termination of the mother's parental rights and could not be considered by the trial court in reaching its decision); In re A.A., 252 Ga.App. 167, 555 S.E.2d 827 (2001) (holding that a summary, prepared by a new caseworker, of the previous caseworker's file was inadmissible hearsay and could not constitute clear and convincing evidence of present unfitness in a termination hearing); In re Adoption/Guardianship No. 95195062, 116 Md.App. 443, 465, 696 A.2d 1102, 1111-12 (1997) (holding that a statute authorizing court reports and psychological evaluations at dispositional proceedings did not allow for the admission, at a termination proceeding, of a psychiatric report containing the doctor's diagnosis and opinion regarding the mother's ability to care for her children); In re Duncan/Walker Children, 109 Ohio App.3d 841, 846, 673 N.E.2d 217, 219 (1996) (holding that reliance on hearsay in an adjudicatory hearing is erroneous)."
890 So.2d at 111. We further stated in Y.M.:
 "The juvenile court's taking `judicial knowledge of the . . . complete contents of each court file,' however, could not remove the documentary materials in the court files from the purview of the hearsay rule. See In re A.B., 308 Ill.App.3d 227, 719 N.E.2d 348, 241 Ill.Dec. 487 (1999) (holding that the trial court erroneously took judicial notice, in a parental-rights-termination proceeding, of the entire neglect file that led to the removal of the children from the mother).
 "`A court may take judicial notice of matters generally known to the court and not subject to reasonable dispute. This includes matters of record in its own proceedings. However, taking judicial notice of matters of record in a court's own proceedings cannot result in admitting hearsay evidence where it would otherwise be prohibited.'
 "In re A.B., 308 Ill.App.3d at 237, 719 N.E.2d at 356-57, 241 Ill.Dec. at 495-96 (citations omitted).
 "`[D]uring a typical proceeding to terminate parental rights, a trial court will likely receive various service plans and reports that may contain information that is hearsay or otherwise inadmissible. Wholesale judicial notice of all matters occurring prior to the unfitness hearing is unnecessary and inappropriate, and a trial court should only take judicial notice of those portions of the underlying court files that have been proffered by the State and to which the respondent is given an opportunity to object.'
 "In re J.P., 316 Ill.App.3d 652, 662-63, 737 N.E.2d 364, 372, 249 Ill.Dec. 974, 982 (2000) (citations omitted)."
890 So.2d at 113. We hold that the child's statement was not admissible on the basis asserted by DHR. We conclude, however, that the statement was cumulative of earlier testimony by Alicia McClain (which the mother did not move to strike) that the child said the mother "gave him weed to smoke." See J.L. v. StateDep't of Human Res., 688 So.2d 868 (Ala.Civ.App. 1997); J.V. v.State Dep't of Human Res., 656 So.2d 1234 (Ala.Civ.App. 1995).
 (B) The "CHIPS" report
When DHR sought to introduce a report prepared by an employee of CHIPS, submitted to DHR caseworker Summer Davis and admitted through the testimony of Alicia McClain, the mother objected, asserting that the report was hearsay and that the proper foundational witnesses were the "personnel of CHIPS responsible for the report." The trial court overruled the mother's objection. *Page 1034 
DHR argued at trial, and now maintains on appeal, that, because the report was sent to DHR and kept in DHR's files, it was DHR's business record pursuant to Rule 803(6), Ala. R. Evid. Rule 803(6) states:
 "A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term `business' as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit."
(Emphasis added.) DHR's argument — that the foundation for admitting a report as a business record may be satisfied by one to whom the report was sent rather than by one whose business it was to make the report — has been rejected by the Alabama Supreme Court. See Ex parte Frith, 526 So.2d 880 (Ala. 1987).
In Frith, the defendant, who was charged with rape, interposed an insanity defense. On cross-examination of defense witness Donna Click, a psychiatric social worker at the Jefferson County jail, the State was allowed to introduce a letter sent to Click by a Bryce Hospital staff psychiatrist. Holding that "the State wholly failed to lay the requisite foundation for the admission of the Bryce psychiatrist's letter," 526 So.2d at 883, the court stated:
 "On cross-examination of Click, the State established the following: (1) that Click received various reports on Frith while he was at Bryce Hospital; (2) that the records used by Click were kept in the normal course of her business as a psychiatric social worker; (3) that she received a letter from a Dr. Thompson, a Bryce psychiatrist, that described Frith's mental condition at the time of the alleged rape; and (4) that Dr. Thompson was a staff psychiatrist at Bryce and had examined Frith on at least one occasion while he was at Bryce. The Court of Criminal Appeals erred in holding that the foregoing facts satisfied the foundational requirements of the Business Record Act.
 "First of all, Click never testified that the letter was made in the regular course of her business as a psychiatric social worker. Obviously, she could not have so testified, because the letter was authored by a third party — a Bryce psychiatrist, who was not associated with Click's `business' in any way. For the same reason, Click did not and could not have testified that it was the regular course of her business to write such a letter. . . . Only the Bryce psychiatrist who authored the letter or another representative of Bryce Hospital could have testified to those foundational facts."
Ex parte Frith, 526 So.2d at 883 (first two emphases in original; third emphasis added). Likewise, in the present case, McClain did not testify, and could not have testified, that the CHIPS report was made in the regular course of her business as a child-abuse-and-neglect investigator at DHR. Thus, because there was no proper foundation for the admission of the report as a business record, its admission was error. The error, however, was harmless because the information in the report was cumulative of other evidence to which, as *Page 1035 
we have held, the mother failed to make a timely objection.
 (C) The written home-study report
DHR foster-care worker Janan Blaylock testified that she conducted a home study of the mother's residence on September 24, 2002. She authenticated DHR Exhibit 4 as her written home-study report. When DHR moved to admit the report, the mother objected, asserting that the report was hearsay. We need not decide whether the written report was admissible as an exception to the hearsay rule because we conclude that the error, if any, in admitting the report was harmless in view of the fact that Blaylock testified, without objection, to everything that was included in the written report. Cf. Worley v. Jinks, 361 So.2d 1082, 1089 (Ala.Civ.App. 1978) (holding that the admission of a report, though hearsay, was harmless because "the information contained in the . . . report was substantially covered in the testimony" of contributors to the report).
 II. Sufficiency of the Evidence
The child was born in 1995. The child's father is deceased. The mother married a man named A.C., who had a 15-year-old son, J.C. The mother and child lived with A.C. and J.C. until April 2001, when the child was removed from the home following allegations that J.C. had sexually abused him. The mother told DHR employees that she did not believe that J.C. had abused the child, and she refused to make J.C. leave the home.
At trial, the mother testified that she still did not believe that J.C. had sexually abused the child. After the child was removed from the home, the mother had supervised visitation with the child until July 2002. DHR halted her visitation after a DHR caseworker saw the mother in court on another matter with J.C. The mother moved to reinstate visitation; her motion was set three different times, but she failed to appear in court. During the time the child was in foster care, the mother paid no child support.
At some point, the mother and A.C. separated, and the mother began a romantic relationship with A.C.'s brother. At the time of trial, the mother testified that she and A.C. were back together, but she said J.C. neither lived with them nor visited in their home. DHR presented evidence that A.C. had been charged with family violence, assault, and public-intoxication offenses.
After the shelter-care hearing, the mother underwent drug testing; she tested positive for methamphetamines and marijuana. DHR offered a number of services to the mother aimed at reuniting her with the child, but she failed to take advantage of any of them. DHR offered the mother public-housing assistance after she and A.C. separated, but the mother did not pursue that offer. DHR referred the mother to Cullman Area Mental Health Services; the mother went once and never returned. Dr. Barry Wood, a psychologist who performed a psychological evaluation of the mother and the child, testified by telephone that his diagnosis of the mother included amphetamine dependence, anxiety disorder, and personality disorder with histrionic and negativistic or passive-aggressive features. He recommended that, in order to be reunited with the child, the mother undergo random drug screens and be drug free for 6 to 12 months, that the mother attend regular Narcotics Anonymous ("NA") meetings for the same period of time, that the mother complete parenting classes and that the mother receive treatment at the Cullman Area Mental Health Center. DHR offered the mother drug-dependency assessment, color-coded *Page 1036 
drug screening, and counseling through court referral services. The court referral officer testified that the mother went for an initial assessment but did not report for drug screening and failed to attend NA meetings. She submitted to a drug screen the day of trial and tested negative. She testified that she had not used drugs for two months.
DHR foster-care worker Janan Blaylock, who conducted a home study of the mother's three-bedroom mobile home, testified that the mobile home was unsanitary, filthy, and dangerous for a child. DHR presented evidence that, upon the mother's suggestion, it had investigated placing the child with the maternal grandmother and a maternal uncle. The grandmother declined to be considered, and DHR found the uncle to be unsuitable because of pending criminal charges against him. DHR determined that there were no viable alternatives to termination of the mother's parental rights, and the mother does not contest that determination. The juvenile court concluded that DHR had established, by clear and convincing evidence, that the mother was unable or unwilling to discharge her responsibilities to the child and that her conduct or condition was unlikely to change in the foreseeable future.
A trial court's decision in proceedings to terminate parental rights is presumed correct when it is based on ore tenus evidence, as here, and its decision will be set aside only if the record reveals the decision to be plainly and palpably wrong.M.J.G.L. v. State Dep't of Human Res., 587 So.2d 1004
(Ala.Civ.App. 1991). When the State is the petitioner in termination-of-parental-rights proceedings, the trial court must apply a two-pronged test in deciding whether to terminate parental rights. First, the court must find from clear and convincing evidence that there are grounds for the termination of parental rights, including, but not limited to, the grounds set out in § 26-18-7, Ala. Code 1975; second, the court must determine whether all viable alternatives to the termination of parental rights have been considered. Ex parte Beasley, 564 So.2d 950,954-55 (Ala. 1990); D.M.P. v. State Dep't of Human Res.,871 So.2d 77 (Ala.Civ.App. 2003).
Section 26-18-7, Ala. Code 1975, sets out the statutory bases for terminating parental rights. The following portions of the statute are pertinent to the facts of this case:
 "(a) If the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child, the court shall consider, and in cases of voluntary relinquishment of parental rights may consider, but not be limited to, the following:
". . . .
 "(2) . . . [E]xcessive use of alcohol or controlled substances, of such duration or nature as to render the parent unable to care for needs of the child.
". . . .
 "(6) That reasonable efforts by the Department of Human Resources or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed.
". . . . *Page 1037 
 "(b) Where a child is not in the physical custody of its parent or parents . . . the court, in addition to the foregoing, shall also consider, but is not limited to the following:
 "(1) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of its support, where the parent is able to do so.
". . . .
 "(4) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review."
We hold that DHR clearly established grounds for termination of the mother's parental rights and the lack of any viable alternatives to termination. The trial court's determination that the mother was unable or unwilling to act as a parent and that her situation was unlikely to change in the foreseeable future is supported by clear and convincing evidence.
The judgment of the Cullman Juvenile Court is affirmed.
AFFIRMED.
PITTMAN, J., concurs.
YATES, P.J., and THOMPSON, J., concur in the result.
MURDOCK, J., dissents.